## STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Environmental Division Unit | ENVIRONMENTAL DIVISION<br>Docket No. 62-6-16 Vtec |

| | |
|---|---|
| Agency of Natural Resources,<br>　　　Petitioner<br><br>　　　　　v.<br><br>Wesco, Inc.,<br>　　　Respondent | DECISION ON THE MERITS |

This matter arises out of Respondent Wesco, Inc.'s (Respondent) alleged release in 2014 of diesel fuel (a hazardous material) into surface water, groundwater and land of the state; Respondent's alleged failure to appropriately respond to the release; and Respondent's alleged failure to train staff for release response, all at or on property at 25 Court Street, Middlebury, Vermont. In a May 3, 2016 Administrative Order (AO),[1] the Vermont Agency of Natural Resources (ANR) alleges violations of the Vermont Waste Management law, 10 V.S.A. § 6616, and Vermont's Underground Storage Tank Rules (UST Rules). The AO sets out factual allegations describing Respondents' prohibited release and failure to appropriately respond to the release and failure to train staff. The AO does not seek further remediation; however, ANR seeks administrative penalties of $43,000 for the violations. On July 1, 2016, Respondent requested a hearing on the AO with this Court.

The Court conducted a merits hearing at the Vermont Superior Court, Costello courthouse in Burlington, Vermont on May 26, 2017. Appearing at the trial were Randy J. Miller, II, Esq. and John Zaikowski, Esq. representing the Agency of Natural Resources and Tristram J. Coffin, Esq. representing Respondents.

---

[1] The AO was filed with the Court on June 24, 2016.

## Findings of Fact

Based upon the evidence presented at trial, the Court renders the following Findings of Fact and Conclusions of Law.

1.      Respondent owns the Middlebury Shell fuel station and convenience store at 25 Court Street, Middlebury, Vermont.

2.      During the afternoon of New Year's Eve, December 31, 2014, a small diesel spill occurred at Respondent's Middlebury Shell gas station as a result of a customer leaving a pump operating unattended.

3.      Although the release was thought to be less than two gallons and therefore not reportable, that same evening, Respondent's store manager reported to ANR that a spill of less than two gallons of gasoline had occurred at the Middlebury Shell station, and that it had been cleaned up properly using Speedi-Dry.

4.      On January 3, 2015, the Middlebury Fire Department discovered that the spill was not fully cleaned up.  The Chief of the Fire Department contacted ANR and reported that the spill had not been adequately cleaned up.

5.      The Fire Department undertook further clean-up efforts including applying additional Speedi-Dry and removal of contaminated snow and soil.

6.      Diesel contamination had migrated to the adjoining neighbor's property.  Additionally, tires and foot traffic had spread diesel.

7.      At the completion of the Fire Departments efforts, the contaminated material was double bagged and transported to the local transfer station as there was no collection device at the subject station.

8.      The store clerks on duty at the time of the release and during the Fire Department's response were not informed of release procedures, and were unable to provide materials to clean the spill or contain the contaminated materials.

9.      The Fire Department Chief estimated the diesel release to be approximately five gallons.

10.     In cooperation with the ANR and the Fire Department, Respondent's environmental compliance director immediately initiated a secondary cleanup response, which was also

2

completed January 3, 2017. Only small amounts of Speedi-Dry was recovered in sidewalk cracks and in the neighbor's driveway during this secondary effort.

11.	On January 23, 2015, the Agency issued Respondent a Notice of Alleged Violation (NOAV) with instructions to complete training of all facility staff and to reassess response protocols.

12.	In response to the NOAV, Respondent trained all facility staff and revised its response protocols.

13.	ANR issued an administrative order (AO) dated May 3, 2016, alleging three violations related to the release.

14.	ANR's cost of enforcement included approximately $360 attributable Environmental Analyst, UST Program, Thomas Edward Unkles' time.

15.	Respondent has three prior violations of 10 V.S.A § 8003 or related rules, permits, orders or assurances of discontinuance in the prior seven years.

## Determining Violations and Penalty Assessment

When a respondent requests a hearing on an AO, we have the authority to determine whether the alleged violation occurred. 10 V.S.A. § 8012(b)(1). ANR carries the burden of proving the alleged violations by a preponderance of the evidence. Id. § 8013(a). If ANR meets this burden, we are required to "determine anew the amount of a penalty" that should be assessed against the respondent challenging the ANR order. Id. § 8012(b)(4). We therefore review the evidence before the Court and determine an appropriate penalty assessment, pursuant to the eight subsections of 10 V.S.A. § 8010(b)(1)–(8).

ANR, and this Court in this proceeding, must consider seven factors when assessing a penalty:

(1) the degree of actual or potential impact on public health, safety, welfare, and the environment resulting from the violation;
(2) the presence of mitigating circumstances, including unreasonable delay by the Secretary in seeking enforcement;
(3) whether the respondent knew or had reason to know the violation existed;
(4) the respondent's record of compliance;
(5) [Repealed.]
(6) the deterrent effect of the penalty;
(7) the State's actual costs of enforcement; and

(8) the length of time the violation has existed.

10 V.S.A. § 8010(b)(1)–(8). The maximum penalty for each violation is $42,500, plus $17,000 for each day a penalty continues. Id. § 8010(c)(1). Generally, ANR treats multiple violations of the same permit, or related violations generally, as one violation when calculating penalties. We take the same approach in this case, and analyze the four violations as a single violation.

The State may also "recapture economic benefit" that the violator may have derived from the violation, up to the total maximum penalty allowed of $170,000. Id. § 8010(c)(2).

In an effort to standardize penalties and ensure a fair process, ANR enforcement officers use a form that is based on the seven factors. They rate the severity of the violations from 0 to 3 for factors (1), (3), (4) and (8), and come up with an initial penalty score. The highest possible initial score is a 15, which equates to an initial penalty of $42,500 for a Class I violation, the maximum allowed. Classes II, III, and IV carry lower maximum penalties of $30,000, $10,000 and $3,000 respectively. The initial penalty can then be adjusted based on penalty factors (2), (6) and (7). If the violator signs an Assurance of Discontinuance, agreeing not to dispute the action, the final penalty may be reduced by 25%.

### Number of Violations

At the outset of the Court's penalty assessment, we recognize that the Administrative Order at issue in this matter alleges three violations: 1) the prohibited release of hazardous materials into the surface, groundwater or land of the state – 10 V.S.A. § 6616; 2) the failure to take appropriate action in response to a release – UST Rules § 8-103(a)(1)(A); and 3) the failure to ensure facility staff have knowledge of appropriate emergency actions to be taken in response to a spill of regulated substance – UST Rules § 8-307(a)(2).

ANR, and therefore this Court on appeal, has discretion to calculate and assess one penalty for events that result in more than one violation or to calculate and assess a separate penalty for each violation stemming from the same activity. In the AO at issue, ANR considered the three alleged violations in one penalty assessment. Because all of the alleged violations stem from the same incident, we conduct a single penalty assessment.

4

The parties do not dispute the core facts of the violations. Respondent offers that the release at issue is a common accident at service stations, had a short duration, and a well-intended remedial response by Respondent. Thus, Respondent contests the amount of ANR fine.

Class of Violation(s)

We conclude that the release and failure to ensure facility staff are appropriately trained events in this matter present a Class II violation. A Class II violation includes violations which present more than a minor violation of a statute listed in 10 V.S.A. §8003(a) or a rule promulgated under statute listed in 10 V.S.A. §8003(a). ANR suggested that the events presented a Class I violation as a threat of substantial harm to the public health, safety, or welfare or to the environment. As detailed below, the release of five gallons of diesel, with a corresponding failure to take appropriate remedial action, and the failure to ensure facility staff are appropriately trained did not result in a threat of substantial harm and we therefore decline to classify the violations as Class I.

Calculation of Base Penalty:

*Penalty Factor 1: Actual or Potential Impact on Public Health, Safety, Welfare and the Environment*

Subsection (1) of 10 V.S.A. § 8010(b) requires consideration of "the degree of actual or potential impact on public health, safety, welfare and the environment resulting from the violation."

In considering ANR's penalty calculation form, we assign a value of "0" to the degree of impact on public health, safely, and welfare (ANR form Question 1) as we conclude there was no evidence of actual impact and only minor potential impact from the release and response. The potential impact on public health, safety and welfare stemmed from the risk of ignition or explosion as well as human exposure to diesel product and fumes. The potential of these risks was minor due to the small volume of diesel release and path that the product migrated over.

We assign a value of "1" to the degree of impact on the environment (ANR form Question 2) as we conclude there was minor actual impact and moderate potential impact to the environment from the release. Diesel was released onto the parking lot and it migrated to the

neighboring property. The credible evidence supports a conclusion that the violation caused minor <u>actual</u> impact that harmed the environment.

*Penalty Factor 3: Whether the Respondent Knew or Had Reason to Know the Violation Existed*

Subsection (3) of 10 V.S.A. § 8010(b) requires consideration of "whether the respondent knew or had reason to know the violation existed." The ANR penalty calculation form includes two parts related to this subsection: 3a, knowledge of the requirements, and 3b, knowledge of the facts of the violation.

Respondents knew or should have known about their legal requirements under the Waste Management statute and the facts of the violation. 10 V.S.A § 6616 is only two sentences long and clearly states that the release of hazardous material to surface or groundwater is prohibited. Thus, in considering ANR's penalty calculation form, we assign a value of "1" for respondents' knowledge of requirements (ANR form Question 3a, which assigns a "1" where respondent "had reason to know about violated requirement").

As to Respondents' knowledge of the facts of the violations we assign a value of "1," concluding there is evidence that Respondent "should have reasonably known that the violation existed" (ANR form Question 3b). For instance, there is clear evidence that respondents knew about the release, because Respondents took prompt action to clean it up by using Speedi-Dry.

*Penalty Factor 4: Respondent's Record of Compliance*

Subsection (4) of 10 V.S.A. § 8010(b) requires consideration of "the respondent's record of compliance." The evidence presented shows that Respondents had three previous violations of ANR's regulations. In considering ANR's penalty calculation from, we assign a value of "3" for this subsection (ANR form Question 4).

*Penalty Factor 8: Length of Time the Violation Existed*

Subsection (8) of 10 V.S.A. § 8010(b) requires consideration of "the length of time the violation has existed." The spill itself lasted for a short duration, and Respondent took clean-up action (even if improperly) on the day it occurred. Respondent also very promptly performed the additional remediation three days later upon learning that the release was not fully remediated. Respondent trained staff on spill remediation.

In considering ANR's penalty calculation form, we assign a value of "1", concluding that this violation existed for a very short duration (ANR form Question 5).

In adding the above penalty scores we arrive at a base score of 6 which equates to a base penalty of $9,000 for a Class II violation.  See ANR form Question 6.

Penalty Adjustments:

We next consider appropriate adjustments to the base penalty.

*Penalty Factor 2: Mitigating Circumstances*

Subsection (2) of 10 V.S.A. § 8010(b) requires consideration of "the presence of mitigating circumstances, including unreasonable delay by the secretary in seeking enforcement."  Although ANR completed, opened and reopened an enforcement matter relating to the diesel release in 2014 and issued Respondent an NOAV on January 23, 2015,  ANR waited until May 2016—nearly a year and a half—to initiate enforcement proceedings.  Furthermore, Respondents responded promptly and attempted to bring the subject property into compliance voluntarily including by retraining staff on appropriate remediation of spills.   This evidence weighs heavily against the timeliness of ANR's actions.

Based on these facts, the Court reduces Respondents' penalty based on mitigating circumstances in the amount of $2,000.

*Penalty Factor 6: The Deterrent Effect*

Subsection (6) of 10 V.S.A. § 8010(b) requires consideration of "the deterrent effect of the penalty."  The Secretary may increase the penalty amount up to the maximum allowed in the class of violation if the Secretary determines that a larger penalty is reasonably necessary to deter the respondent and the regulated community from committing future violations.  Id.  In this matter the maximum penalty is $30,000 and the base penalty we have calculated is $9,000, allowing for a maximum deterrent of $21,000.

In reviewing the importance of establishing a penalty that will have a deterrent effect upon Respondents, we consider that Respondents were cooperative with ANR throughout the investigation and remediation of the release.  Furthermore, we conclude that the short period of time that the violations existed, and Respondents prompt and complete remediation of the release does not warrant a deterrent portion to be added to the initial base penalty.

*Penalty Factor 7: State's Actual Costs of Enforcement*

Subsection (7) of 10 V.S.A. § 8010(b) requires that we consider "the state's actual cost of enforcement." The value of the time that all ANR officials committed to responding to Respondent's violations, including prosecution of this matter, totals $360. We direct Respondents to reimburse these costs as an additional penalty for the violations.

*Economic Benefit*

The Secretary may recapture any economic benefit Respondents may have gained by violating its permit. 10 V.S.A. § 8010(c).

While we believe that recapturing economic gain from a violation is appropriate, we conclude that based on the evidence before the Court, it appears that Respondents did not realize a gain or economic benefit from the violations. Thus, we decline to impose any amount of additional penalty relating to economic gain.

*Reduction for Settlement*

Finally, ANR may reduce a respondent's penalty when the respondent admits the violation and enters an Assurance of Discontinuance fully resolving the compliance issue. Such a reduction is not warranted in this matter as Respondents did not resolve their dispute by settlement.

The Court therefore decreases the base penalty of $9,000 by subtracting mitigation for ANR's delay in initiating enforcement and Respondents prompt investigation and remediation in the amount of $2,000 and add $360 as reimbursement of ANR's costs of enforcement. The total penalty in this case is $ 7,360.

## Conclusion

For the reasons stated above, we conclude that for the three violations at issue within the May 3, 2016 AO, Respondents shall be liable for a total penalty in these proceedings of **$7,360**.

## Rights of Appeal (10 V.S.A. § 8012(c)(4)–(c)(5))

This Decision and the accompanying Judgment Order will become final if no appeal is requested within 10 days of the date this Decision is received. All parties to this proceeding have a right to appeal this Decision and Judgment Order. The procedures for requesting an appeal are

8

found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to superseding provisions in Vermont Rule for Environmental Court Proceedings (V.R.E.C.P.) 4(d)(6). Within 10 days of the receipt of this Order, any party seeking to file an appeal must file the notice of appeal with the Clerk of the Environmental Division of the Vermont Superior Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court. 10 V.S.A. § 8013(d). A party may petition the Supreme Court for a stay under the provisions of the Vermont Rules of Civil Procedure (V.R.C.P.) 62 and V.R.A.P. 8.

Electronically signed on October 23, 2017 at 11:35 AM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division